### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| GAYLIN ROSE, | ) | |
|       Plaintiff, | ) | |
|     v. | ) | CASE NO: 2:18-cv-00197-PPS |
| | ) | |
| BIRCH TREE HOLDINGS, LLC, | ) | |
| JOSHUA AYRES, and TROY HELDERMAN, | ) | |
|       Defendants. | ) | |

### PLAINTIFF'S RESPONSE OPPOSING DEFENDANTS' MOTION TO EXCLUDE

Plaintiff, by undersigned counsel, offers the following Response Opposing Defendants Birch Tree Holdings, LLC's, Joshua Ayres,' and Troy Helderman's June 13, 2023 Motion to Exclude Plaintiff's Expert Witnesses, Candace Ashby, Mark D. Culver, Michael A. Vergon, and Defendants' designated witness, Jeff Tipton from testifying at trial:

In the interests of avoiding needless repetition, all arguments and facts stated below are incorporated into each argument where they are mutually relevant.

### ARGUMENT

**I.   PLAINTIFF PROPERLY DISCLOSED THE SUBSTANCE OF EXPERT OPINIONS OF CANDACE ASHBY AND MARK D. CULVER OR ANY DEFECT IN DISCLOSURE IS JUSTIFIED AND HARMLESS TO DEFENDANTS.**

Defendants argue that Plaintiffs' disclosure of experts Ashby and Culver failed to comply with Rule 26(a)(2) because it did not include the substance of their testimony and the reasons therefore. [DE 264 at 4] This motion is unfounded. Plaintiff disclosed these expert witnesses on August 5, 2021 stating the sum and substance of their opinions for trial:

    1. Dr. Candace Ashby is a witness Plaintiff may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. She prepared and signed the attached written report.

    2. Dr. Mark D. Culver is a witness Plaintiff may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. He prepared and signed the attached written report.

**(See Plaintiff's Expert Disclosure attached in its totality hereto as Plaintiff's Exhibit A.)**

The Ashby/Culver report attached to the disclosure states clearly that the opinions are the result of

their *initial* assessment, and it lists the facts and data they considered in reaching their opinions, along with the opinions and their basis for same, and their testifying experience; and their immense experience and other qualifications are further detailed in the attached CVs:

1. This report therein constitutes our initial assessment and conclusion with a reasonable degree of professional certainty of actions and procedures employed by forensic fire experts in connection with origin and cause investigation and findings regarding this matter. Our opinion is based upon our experience, training, education, and review of documents provided by Plaintiff's counsel. Our compensation for the study and testimony in the above case is one hundred and fifty dollars per hour.

2. Our attached curriculum vitae lists our qualifications and all publications we have authored in the past ten years.

3. Dr. Ashby has testified once as an expert by deposition, State Farm Fire & Casualty Company v Just Add Water Boats, during the previous four years. Dr. Culver has testified once as an expert by deposition, State of Indiana v Brandon Abbott, during the previous four years.

4. Upon reviewing the provided documents, and with a high degree of knowledge and expertise in origin and cause investigation and findings, it is our professional opinion that the cause and origin of the fire in this matter is undetermined. Furthermore, we have come to the following opinions:

a. We have reasonable belief that the absence of a smoke detector contributed to the deaths of the four minor children in this case because properly working smoke detectors are designed to provide early detection during a fire to allow occupants time to evacuate.

5. The following are the facts or data we considered in forming our opinion:
a. Inspection of the property at issue
b. Destructive testing of the range from the property at issue
c. Records from the Indiana State Police
d. Records from the Flora Police
e. Records from ATF
f. Records from Carroll County Sheriff
g. Records from Indiana Department of Homeland Security
h. Records from Indiana State Fire Marshall
i. Report of Kelly J. Good
j. Report of Michael A. Vergon

Attached are photographs to support our origin and cause opinion.

**(Plaintiff's Exhibit A at 3-4.)**

Defendants take issue with the brevity of this joint report, but other than making a blanket complaint that it is not detailed enough, they do not describe what is missing from it, nor how they were prejudiced by it. Dr. Ashby was first disclosed September 20, 2018 in Plaintiff's Initial Disclosures. [DE 216-1] She then attended <u>joint inspections</u> of the site on November 5, 2018, and December 19, 2018 - of which

Defendants necessarily had full notice because their own experts were present. [DE 216-2; DE 216-3] Then, on August 5, 2021, Plaintiff made the above-quoted expert disclosure [DE 207-1], to which Defendants made no objection nor any formal or informal request for clarification or additional information. Defendants then noticed Ashby's deposition on December 3, 2021 [DE 216-4], and Defendants deposed Ashby on December, 21, 2021. [DE 196-29].  No time limit was imposed and Defendant expended a great deal of time asking numerous questions and obtained all of the experts relevant opinions.

At deposition, Ashby explained that her report is <u>necessarily</u> brief because the cause and origin of the fire is <u>undetermined</u>. [DE 196-29, p. 87] (**See, Ashby Deposition, attached hereto as Plaintiff's Exhibit B.**) Defendants questioned Ashby to their hearts' content on the brevity of the report and Ashby explained that the nature of an "undetermined" fire means that experts are unable to determine what started it (*id*., p. 63) and if that had been determined, the report would have been considerably longer. (*Id*., p. 87-88) Consequently, a short report is appropriate and does not constitute a violation of Rule 26. Expert witness disclosures and their "reports need not contain every detail of an expert witness's testimony" *Jager v. Andrade-Barraza*, 2019 WL 6896643, at *8 (D.N.M. Dec. 18, 2019) (citation omitted). Any perceived deficiencies in the report are harmless under Rule 37(c) because the district court has "broad discretion" to determine harmlessness, where there is no resulting "fundamental unfairness in the trial of the case." *Id*. at *9 (citation omitted). Furthermore, sanctions are unwarranted because "there is neither evidence nor argument to support a finding of bad faith or willfulness on Plaintiff's part." *Id.*, at *10.

Here, it cannot be disputed that, at all times relevant to these experts' various investigations and reports, Defendants were fully informed as to the undetermined cause and origin of the fire and of the State of Indiana's public statements as to cause and origin. Initially, State investigator Denny Randle <u>publicly</u> stated that the fire was caused by accident, likely by the refrigerator cord having been pinched, but then later he <u>publicly</u> stated that the cause was incendiary, despite the incompleteness of investigations and the absence of crucial confirmatory testing, which was recommended and actively sought out by fire investigator, Jeff Tipton, who was employed by Defendants' insurer since the date of the fire, and whom Defendants initially disclosed as being expected to testify to cause and origin. (**See Tipton Deposition,**

attached hereto as Plaintiff's Exhibit D, at pp. 38-52, *passim*.) Thus, any claim of harm to Defendants in this regard is unfounded.

Ashby testified: "My report is very short and right to the point of the origin and cause because it's undetermined." (*Id*., p. 86-87) "... it's an undetermined call. So how much do I need to go down that road of saying this is why it's undetermined because I don't even know where it started. I don't know how it started." (*Id*., p. 87.) "[W]e were really trying to identify that area of origin, and we were looking at all the potential causes, and we were coming to an undetermined conclusion that we didn't know exactly what started it." (*Id*., p. 46) Ashby testified that she had received a dash cam video the night before and had reviewed it, but that none of her stated opinions were changed as a result of that video. Instead, the video "solidified" her opinions. (*Id*. p. 73). Also, some of the essential evidence of the fire's origin had been removed by the Indiana State Police. Their investigation was not shared with Plaintiff nor their experts. The evidence removed was the flooring from the rear entrance of the housing unit. Thusly, no evidence to substantial the burn pattern that lead to the fire's entrance into the residence.

Brevity alone does not make Ashby's report incomplete or otherwise noncompliant with Rule 26. To the extent that it is deemed to be noncompliant, Defendants demonstrate no harm whatsoever because Dr. Ashby testified that her written report is the entirety of her opinion for trial and even new video evidence she viewed the night before deposition only reinforced her opinions. (*Id*. p. 73)

Culver was deposed on the same date as Ashby, December 21, 2021. He testified that he did not feel the need to see more evidence and that the report included his entire opinion for trial because the cause of the fire is undetermined, and any working hypotheses cannot be ruled out. (Culver, pp. 27-29; 37; 59; 62-63; 65; and 71) (**See, Culver Deposition attached hereto as Plaintiff's Exhibit C.**)

Culver did add, however, that the evidence he received the night before his deposition, referred to as the "body cam" video (meaning dash cam), showed a relatively slow-moving fire, compared to a fire with accelerants. (*Id*. pp. 65-66) "His car is facing to the east. So, he's looking at the west side. And it took 12 minutes -- 12 to 15 minutes before it got a large enough fire to go out into that other room, in other words. ... From that video, we could tell kind of the speed of the fire." (*Id*. p. 66). The dash cam and body

cam video was not properly produced by Defendants nor the Sheriff Department.   It was only discovered during the deposition of Todd Hetrick.

Brevity as to his report is, thus, appropriate and if deemed to be noncompliant with Rule 26, Defendants have demonstrated no harm, and Culver's testimony should also be allowed.

Defendants argue that *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008) mandates exclusion because the noncompliance of Ashby's and Culver's report is "not harmless." [DE 264 at 6] But *Ciomber* is easily distinguishable. There, the noncompliance was unjustified. Here brevity is justified by the indeterminate cause of the fire, and additional testimony relative to the dash cam video is justified by the fact that Defendants provided it the day before Ashby's and Culver's depositions. In *Ciomber*, the movant was "forced to depose Mniszewski with little or no understanding as to what he would testify." *Id.* at 643. Here, Defendants chose to depose these witnesses very early in the litigation and the witnesses offered no new opinions and even testified that dash cam video, withheld until the night before their deposition, strengthened or confirmed their opinions. Thus, *Ciomber* does not mandate exclusion and any noncompliance with rule 26 is "substantially justified or is harmless" pursuant to Fed R. Civ. P. 37(c)(1).

## II.    DEFENDANTS FAIL TO OFFER ARGUMENT AND AUTHORITY TO EXCLUDE MARK D. CULVER AS UNQUALIFIED TO OPINE ON CAUSATION.

Defendants offer no argument or authority in support of their motion to exclude Culver for lack of qualifications to testify as to <u>causation</u>. [DE 264 at 6-9] Thus their motion should be deemed abandoned as to this ground.

## III.    DEFENDANTS FAIL TO DEMONSTRATE THAT CULVER IS UNQUALIFIED TO OPINE THAT THE ABSENCE OF A SMOKE DETECTOR CONTRIBUTED TO THE DEATHS IN THIS CASE BECAUSE PROPERLY WORKING SMOKE DETECTORS ARE DESIGNED TO PROVIDE EARLY DETECTION DURING A FIRE TO ALLOW OCCUPANTS TIME TO EVACUATE.

Defendants argue that Culver is not qualified to offer the following opinion:

a. We have reasonable belief that the absence of a smoke detector contributed to the deaths of the four minor children in this case because properly working smoke detectors are designed to provide early detection during a fire to allow occupants time to evacuate.
(Plaintiff's Expert Disclosure, Ex. A, p. 3).

[DE 264 at 9] Defendants call the necessary area of expertise "evacuating" [DE 264 at 9, 12, 15] and they

challenge Culver's above opinion by claiming: "Culver is not qualified to render this opinion. His training and experience centers on cause and origin investigations—not on the scientific basis for an occupant of an apartment being alerted to a smoke alarm, discerning the context, and escaping the apartment safely." (*Id.*)

However, Defendants offer no authority whatsoever for their argument that "being alerted to a smoke alarm, discerning the context, and escaping the apartment safely" are scientific topics, nor that they are separate or distinct from Culver's lengthy and various education and experience relative to fires, fire safety and fire investigations. Nor do Defendants offer any *authority* showing factors Culver should have considered prior to reaching the above opinion. Instead, they offer their own opinions as to what Culver lacks and what his method lacked.

Culver's CV is many pages long and cannot be detailed here and Plaintiff asks the court to review it in its entirety. Plaintiff contends that logic dictates that Culver's challenged opinion requires expertise in fire safety, public safety, fire investigations, forensics, fire survival, building construction and building Code issues, in which Culver is amply qualified. Relative to these areas, his CV shows that, as a Lieutenant with the Indianapolis Fire Department ("IFD"), Culver conducted building inspections and public fire education from 1994-1996. He was a Firefighter/Engineer with IFD from 1984 to 1991. He taught at Harrison College in Indianapolis from 2010 to 2013 as an Adjunct Instructor in Criminal Justice, Forensics, and was acted as Public Safety Subject Matter Expert for developing a Fire Science Program. He taught Fire Science at Columbia Southern University in Orange Beach, Alabama from 2014 to 2017 and acted as Fire Science Course Writer for Forensic Fire Investigations Courses.

Culver received his Ph.D. in Public Safety, with a concentration in Forensics in 2015 from Capella University, Minneapolis, MN and received his Master of Science in Public Safety Leadership with a concentration in Forensics from that University in 2011. He received numerous professional certifications from various Fire Departments, Marion County Indiana Sheriff's Department, the National Fire Academy and ATF programs from 1984 to 2004. Culver holds numerous credentials from the State of Indiana, including, but not limited to: Master Fire Prevention/Inspections; Master Investigations; Master Instructor (National Fire Prevention Agency); Fire Investigator; and Fire Safety Officer. Culver holds credentials from

the National Fire Academy, including, but not limited to Firefighter Safety and Survival; and Building Construction and literally *pages* more. **(See Plaintiff's Exhibit A)**

At deposition Culver testified to the bases of this opinion saying it comes as a result of the accumulated experience working in the fire service his entire adult life **(Plaintiff's Exhibit C, p. 75)** and: "Being in the fire service for one thing, you know, *we see it on a daily basis. Smoke detectors work, and they get people out in time"* and*,* in fact, in all his experience he had never investigated a fire where there had been underlined functioning smoke alarms, and there had been deaths. (*Id*. pp. 73-74) He also testified that the video evidence he was provided only the night before showed what in his experience in fire service he believed to be a relatively slow moving fire; that it appeared to be an unaccelerated fire because of its slow movement; that while the point of origin is undetermined, the video showed that the fire was moving from the southeast corner of the house, and at the time of the video it was moving from the dining room towards the living room and front door, which took 12-15 minutes; that in his experience fighting and investigating fires, smoke alarms are loud and can be heard over other loud noise and chaos in fires and fire rescue scenarios; that the Sheriff's dash cam and body cam video would have picked up the sound of a smoke alarm but there was none audible; that it appeared from the video that it would have taken 12-15 minutes for the fire to progress to the children upstairs; that in his experience smoke alarms sound in the presence of much less smoke than is generated by house fires; that in all his experience, he had never been involved with fire fatalities where there were functioning smoke alarms; and, that had there been working smoke alarms here, the Mother and her children would likely have had 12-15 minutes, which would likely have been adequate to allow them to escape the fire. (See, *id*. at 65-66; 73-74; 77-78; 83; 89-91; 104)

Culver testified that it is *also* common sense that smoke detectors save lives (*Id*. pp. 75-76) but he did not testify that his opinion results solely from common knowledge. No authority requires an expert to divorce his opinions from common knowledge when the two intersect. And Culver clearly could not have included the details of his analysis of the video in his report, because Defendants withheld that video until the night before Culver and Ashby's December, 21, 2021 depositions. Defendants' expert Hetrick testified that he was absolutely certain that he had received the videos in this case before November 8, 2021. (**See,**

**Hetrick deposition at 14, attached hereto as Plaintiff's Exhibit E.**) Thus, Defendants held onto and did not produce this video for more than a year. Plaintiff intends to seek the fullest possible sanctions for this and any other ethical violations, spoliation and discovery abuse by Defendants and she reserves her rights to do so.[1]

For all of these reasons, Defendants have failed to show that Culver is not qualified to render the above challenged opinion.

## IV.   DEFENDANTS FAIL TO SHOW THAT CULVER'S OPINIONS ARE BASED ON UNSCIENTIFIC OR UNRELIABLE METHODS.

Defendants challenge Culver's methods in reaching the opinion that "the absence of a smoke detector contributed to the deaths of the four minor children in this case because properly working smoke detectors are designed to provide early detection during a fire to allow occupants time to evacuate." [DE 264 at 9-15] In challenging his method, they cherry-pick his testimony as to tests and information which were *unavailable*, due to the undetermined cause and origin of the fire, and due to the absence of working smoke alarms. (See, Culver at 84.)

Defendants entirely neglect Culver's testimony as to his lengthy experience and training in fires, fire safety, fire investigations and so on, and also based on his observations and analysis of the video of the fire, described in Argument III, above. (See Culver at 65-66; 73-74; 77-78; 83; 89-91; 104.) "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

Defendants continue to label Culver's opinion an "evacuating" opinion, despite that it clearly stems from Culver's experience and expertise in fire safety, public safety, fire investigations, forensics, fire survival, building construction and building Code issues. And Defendants offer no authority whatsoever for their argument that their chosen factors (related to the phase of sleep one is in when a smoke alarm

---

[1] Todd Hetrick allegedly found a smoke detector on the kitchen table that suddenly appeared in April 2021. The facility was not secured to prevent tampering via any electron monitoring or surveillance.  Jeff Tipton lost the non-working smoke alarm.   The non-working smoke alarm was discarded in December 2020. (See Tipton deposition, page 162/14- to 163/5.

sounds, the type of alarm, the stage of the fire and other factors specific to hypothetical but in this case nonexistent working smoke alarms) are the *only* factors or even the *appropriate* factors to be considered in rendering this opinion.

Defendants argue that calculations should have been made before Culver opined as to how long it would have taken for Plaintiff to get her children out of the house, but that is not what he opined. He did not opine as to a minimum, average, or other measure of how long it would have taken Plaintiff to leave her bedroom and climb the stairs to her children's bedroom and back down again. That would be an opinion based on common knowledge that a jury, familiar with waking up, climbing stairs, and ordinary two-story residences, could formulate without expert assistance.

Culver's opinion focused on the likely amount of time Plaintiff would have had between waking from the sound of an alarm alerting to a small amount of smoke, and getting her children out, based on his experience as a fire fighter with, among other things, the sensitivity of smoke alarms and their loudness, generally; their <u>universal acceptance</u> [2] as scientifically designed to provide early fire detection in the event of a fire; and the slow-moving nature of the fire as being the factors he felt were relevant to consider. (See, id. at 65-66; 73-74; 77-78; 89-91; 104).   Interestingly, Defendant failed to explain why they failed to produce essential evidence that illustrated that the fire was slow burning and deaths likely attributed to smoke inhalation.

Defendants offer no authority for their premise that Culver's inferences from the evidence listed on his report, along with the video evidence he viewed the night before, based on his experience, training and expertise over a career in fire service, are unscientific and unreliable. Instead, they offer their own opinions as to what Culver lacks and what his method lacked in reaching what they call an "evacuating" opinion.

## V.    DEFENDANTS FAILED TO SHOW THAT MIKE VERGON IS NOT QUALIFIED TO RENDER AN EXPERT OPINION.

---

[2] Indeed, the fact that Indiana law requires smoke detectors to be placed on every story and outside every bedroom of a residence, hotel, motel or other dwelling, demonstrates that at least in the State of Indiana, smoke alarms are universally accepted to be effective fire safety devices. See, IC 22-11-18-3.5 and 22-11-18-2.

Defendants contend that Vergon is unqualified to render the following opinion:

My second opinion regarding smoke detectors is that if they had functioned or if there was one in the kitchen, that the outcome of this probably would have been a lot different.
(Vergon Dep. 98:6-10, Ex. C).

Defendants argue that Vergon is an as an expert in fire/explosion investigation and interviewing, but not on smoke alarms and that his experience and understanding, that smoke alarms are helpful and save lives generally is somehow the only basis for his above-quoted opinion, and that it is insufficient. [DE 264 at 15] But they offer no argument, and they cite to not authority showing that Vergon's education, training and experience are inadequate to allow him to give the above opinion. In fact, their entire argument on this point contains no citation to any authority. [DE 264 at 15] Thus, their motion to exclude Vergon for lack of qualifications should be deemed abandoned.

## VI. DEFENDANTS FAIL TO SHOW THAT VERGON'S METHOD WAS UNSCIENTIFIC OR UNRELIABLE.

Defendants next challenge Vergon's method in reaching the above-quoted opinion as unscientific. [DE 264 at 16] But their entire argument on this point contains no citation to authority whatsoever. [DE 264 at 16-17] The argue that the basis for Vergon's opinion that functional smoke alarms, especially one in the kitchen, probably would have changed the outcome, is based on what they call an "experiment":

A· So I -- well, it's -- I have it detailed in here. But basically what I did was I walked from her bedroom to the dining room, to the point where she said she stopped and looked and saw smoke. I paused in the dining room for a few seconds, because you'd probably take a second or two to try to figure out what's going on by looking into the kitchen. And then, based on her statement to me that she went halfway up the stairs and then couldn't make it because of the smoke, so I left -- I turned, and I walked halfway up the stairs. She said she called out to her girls. So I maybe paused for a couple of seconds, midway up the staircase, and then turned and walked back downstairs and out the front door.

[DE 264 at 16] (**Quoting from Vergon Deposition, pp. 87-88 attached hereto as Plaintiff's Exhibit F).**

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. That is precisely what Vergon did here. Vergon specifically testified that he did not speculate about how long it would have taken Plaintiff to get the children out after hearing a smoke alarm, because there was no such alarm. Instead, he conducted a "test walk through of the

house based on [Plaintiff's] observations and what she told me." (Vergon p. 87) He testified that this sort of testing is not "standard" because it varies depending on many circumstances (*id*. p. 88), and that he generally likes to "recreate" the scenario faced by the individual, and likes to get information directly from the witnesses' perspective. (*Id*. p. 89)

When asked whether this sort of testing is accepted in fire investigations, he answered that his estimate of 37 seconds was more conservative than some other investigators might give. (*Id*.) When asked if this was the industry standard, he answered that he is not aware of any industry standard as to this sort of information gathering, but that he relies on logic, reasoning and the scientific method. He explained:

> A· I just wanted to see, for my own personal edification, that, okay, she's describing smoke to a certain extent. There's smoke over her head already in the dining room. I'm trying to get a feel for fire progression. Where does she see fire? Where does she not see fire? Okay. How fast is the smoke progressing through the house? Just trying to get an idea in my head what's going on, trying to put myself in that person's shoes, like I always do on a fire scene. And then retracing her steps to see, you know, what makes sense, what doesn't make sense. So it's not in any literature anywhere, but it's something I do on fire scenes. Not every time, because every time -- it doesn't apply every time. But I do it on quite a number of fire scene investigations I work.

(Vergon, p. 90) He also testified that in his experience, there are many factors in determining whether and how someone can escape a fire, some of which would not have been a factor at an early stage of a fire; and he considered whether Plaintiff woke at an early stage of the fire, because she did not see flames, she only saw the kitchen doorway filling up with smoke. (*Id*. p. 91; 95-97)

Defendants fail to show that this approach to information gathering and testing under the circumstances of this case are unscientific or unreliable. Courts "expect experts to gather information from multiple sources and cross-check factual information." *In re Terrorist Attacks on September 11, 2001*, 2023 WL 3116763, at *7 (S.D.N.Y. Apr. 27, 2023) (citation omitted) (punctuation omitted). And experts are necessarily bound to the facts and circumstances presented to them.

When asked about his information relative to how long it might take a person asleep to wake up and respond to a smoke alarm, he answered that he relies on his fire training and test burns, where there is a smoke alarm that sounds and they keep track of the time of events that follow. (Vergon at p. 93) But

Defendants do not show that his "conservative" approach to estimating the time needed to get out and his reliance on this training is inadequate to render his opinion in this case.

Instead, Defendants mischaracterize his testimony as showing that "Vergon's methodology [is] not used in his profession." [DE 264 at 17] And they fault Vergon for not considering "the geometry of the house and how that would affect the smoke alarm's sound traveling or whether Plaintiff actually heard the smoke alarm." *Id*. But we know that these factors are untestable because there was no such alarm. And they fault him for not determining the amount of time "between a smoke alarm sounding in the kitchen thereby waking Plaintiff versus when Plaintiff actually woke up (and what woke her up)." [DE 264 at 17] But, once again, these factors cannot be determined and compared because there was no such alarm. Additionally, they failed to provide a copy of the dash cam video showing the slow burning fire in the unit; this would have allowed sufficient time for escape by the Plaintiff and her children.

Additionally, Defendants' expert, Hetrick, did not rule out the possibility that Plaintiff and her children could have escaped, had there been working smoke alarms. He testified that he disagreed with Vergon on the basis that it is likely that the amount of time available for them to escape would have been shorter in an incendiary fire, due to the presence of accelerants. (Hetrick Deposition, p. 117) But he also testified that the primary purpose for smoke alarms is "for life saving" and that the "certainly do" help save lives. (*Id*. p. 65)

Moreover, Tipton (Defendants' initially designated testifying witness) testified that Rose's neighbors in the duplex survived the fire because their smoke detector worked. (Tipton p. 157, lines 11-19) Thus, Defendants' objections to Plaintiff's expert witness testimony that working smoke alarms *could have* allowed Plaintiff and her children to escape the fire - the general consensus among all expert witnesses in this case, are baseless. Additionally, it is a well-known accepted principle by the United States government that smoke alarms saves lives. [3]

---

[3] See Consumer Product Safety Commission Smoke Alarms-Why, Where, and Which, CPSC Pub. 559. The publication stated, in relevant parts: "Every year in the United States, about 3,000 people lose their lives in residential fires. In a fire, smoke and deadly gases tend to spread farther and faster than heat. That's one reason why most fire victims die from inhalation of smoke and toxic gases, not as a result of burns. A majority of fatal fires happen when

## VII.    DEFENDANTS FAIL, A SECOND TIME, TO MEET THEIR BURDEN TO SHOW THAT TIPTON IS A CONFIDENTIAL CONSULTING EXPERT.

Defendants' motion to exclude Jeff Tipton as a testifying witness at trial fails for the same reasons its motion for protective order [DE 151] failed to prevent Tipton's deposition - Defendants do not demonstrate that the expert was retained in anticipation of litigation (*In re Asbestos Products Liab. Litig. (No. VI)*, 256 F.R.D. 151, 156 (E.D. Pa. 2009) (citation omitted)), rather than as standard practice in fire investigation (*Rose v. Birch Tree Holdings, LLC*, 2021 WL 6049453, at *2 (N.D. Ind. Dec. 21, 2021).

Defendants claim, "Tipton was hired by Auto-Owners Insurance Company, the liability insurance carrier for Birch Tree, to inspect the fire scene *to protect the interests of its insured*, *Birch Tree*." [DE 264 at 18] (emphasis added). But Defendants do not present evidence that this is true, and it is equally, if not more likely, that Auto Owners hired Tipton to protect its own interests as the insurer, for use in determining coverage and exclusion issues. (Undoubtedly, if Auto Owners concluded that Birch Tree set the fire, coverage would have been denied.)  For example, at least one police report suggested that the fire was actually set by one of the defendants to collect insurance proceeds.  [4]

And, despite the Court's admonishment in the order denying their previous motion, Defendants *again* fail to attach a privilege log to their materials. "Without such a description, this Court is unable to assess whether the material and information should indeed be protected[.]" *Rose v. Birch Tree Holdings, LLC,* at *2.

Defendants argue that they "provided a very detailed "privilege log" of Tipton's file materials" [DE 190-8] to which they believe the consulting expert privilege attaches. [DE 264-20] But, just as with their motion for protective order, Defendants failed to attach a privilege log to their motion or memorandum; they reference no item in it as privileged; nor do they point to any particular portion of Tipton's deposition testimony as privileged. "Defendants argue that the information being sought is privileged because it is

---

families are asleep because occupants are unaware of the fire until there is not adequate time to escape. A smoke alarm stands guard around the clock and, when it first senses smoke, it sounds a shrill alarm. This often allows a family the precious but limited time it takes to escape."
[4] See Exhibit 581. At p. 4) attached.  Flora Police Department investigation of the fire.

consultant's work product, but have failed to meet their burden of identifying the protected information and/or materials, instead asserting a blanket objection to the request, and failed to attach a privilege log to their Motion for a Protective Order ... Without such a description, this Court is unable to assess whether the material and information should indeed be protected[.]" *Rose v. Birch Tree Holdings, LLC,* at *2.

More importantly for this motion, Defendants fail to address, let alone refute, the evidence adduced from Tipton himself, that he never was and is not now a consulting expert to Defendants:

1) Tipton had no consulting agreement with Auto Owners, Defendants or their counsel;

2) Tipton was never restricted by Auto Owners or anyone else as to with whom he could share information;

3) Tipton was not paid by any defense lawyer in this case;

4) Tipton's employer, State-Wide was not paid by any lawyer on the case, but for *Plaintiff's* lawyer, who hired State-Wide to perform testing on the range in the kitchen; and State-Wide sent another investigator ("Nate") to perform that work, completely separate from Tipton's investigation;

5) Auto Owners hired Tipton's employer, State-Wide, to investigate cause and origin of the fire;

6) State-Wide sent Tipton to perform that investigation;

7) Tipton reported back to Auto Owners, who paid State-Wide for his work;

8) Auto Owners told Tipton to stop his investigation in September or October 2017, before he had finished it, reached conclusions as to cause and origin, or prepared a report; and,

9) Tipton had no direct contact with defense counsel for the 3 years preceding his January 2022 deposition, other than the perfunctory notification he received from Mr. Lemon in late 2021, advising Tipton he was to be deposed, but not discussing the case.

10) Tipton collected evidence from the fire scene, the smoke alarm that did not contain a battery; and he discarded the smoke alarm evidence in December 2020.

(**See Plaintiff's Exhibit D, Tipton Dep**. at 14/20-25; 18/12-14; 31/22-32/3; 32/10-23; 38/2-4; 41/1-23; 47/15 - 48/1; 53/12-17; 82/17-19; 83/12-21; 84/25-85/1-15; 152/5-9; 182/3-5; 190/15-18; and 20-24; 191/1-4 and 16-19; 192/5-9);162, 21/25.

Despite that Auto Owners' counsel was present and participated in Tipton's deposition, (*Id.*, 170/23-171/6; 185/1-190/11), Auto Owners did not question Tipton pertaining to whether Auto Owners hired Tipton "to protect the interests of its insured", as Defendants now claim. But he asserted, "[T]here is no impact on coverage that is resulting from this expert's investigation as far as I can tell." (*Id.* at 170/ 18-21; 171/2-4) And Auto Owners has never stated one way or the other whether it hired Tipton to protect its own interests or that of its insured.

Defendants objected to Tipton's deposition, stating that Tipton "*continues to be a consulting expert*" for Defendants (Tipton 6/6); and their motion claims that Tipton collected information at the fire scene on November 21, 2016 that was "used that day to assess Birch Tree's potential liability." [DE 264 at 19] But they offer no evidence, asserting:

> No more information on this point can be provided since it is privileged. That is the corner that Plaintiff backed Birch Tree into. Providing additional evidence of the consulting expert privilege requires breaking privilege and possibly harming the defense.

[DE 264 at 19, note 3]

This argument lacks credibility, and is not borne out by the evidence, because Tipton testified, more than a year ago, that he had no such consulting agreement nor any confidentiality restrictions of confidentiality placed on him, nor any other indicia typical of consulting witnesses. (Tipton at 14/20-25; 18/12-14; 31/22-32/3; 32/10-23; 38/2-4; 41/1-23; 47/15 - 48/1; 53/12-17; 82/17-19; 83/12-21; 84/25-85/1-15; 152/5-9; 182/3-5; 190/15-18; and 20-24; 191/1-4 and 16-19; 192/5-9)

Thus, Tipton's deposition evidence shows that if Tipton was a confidential consulting witness, it was a total secret to him and everyone else, including Defendants' attorney who disclosed Tipton as a testifying witness. Had Birch Tree or Ayres ever confidentially consulted with Tipton, their motion easily *could have* stated the dates and times when they did so, and who was present for the consultations. Defendants *could have* listed items they or their counsel prepared relative to such consultations, e.g., notes; diagrams; charts; and they *could have* listed items they received from Tipton relative to such consultations, (notes, photos, etc.) with sufficient particularity to allow the court to determine the validity of the privilege claimed. But they did none of that even though it was their second go-round on the issue of Tipton's

evidence, and it is their burden of proof.

The party resisting discovery has the burden of demonstrating that the expert was retained in anticipation of litigation. *In re Asbestos Products Liab. Litig. (No. VI)*, 256 F.R.D. 151, 156 (E.D. Pa. 2009) (citation omitted). "Where there is no evidence of the scope and nature of the expert's services as pertaining to the litigation or work done unrelated to litigation, an individual will likely not be considered a non-testifying litigation consultant and the consulting expert privilege will not attach." *Id.* (citation omitted).

It is undisputed that Auto Owners hired Tipton's company to investigate cause and origin of the fire. It is undisputed that "Tipton visited the fire site on November 21, 2016, the date of the fire and November 23, 2016" and that that suit was filed May 18, 2018. (*Rose v. Birch Tree Holdings, LLC*, 2021 WL 6049453, at *2). It is undisputed that Tipton was on site several times thereafter, as were Plaintiff's experts and numerous and varied law enforcement agencies. But, once again,

> Defendants have failed to meet their burden of establishing that [Tipton's] visits were done in anticipation of litigation, rather than standard practice in fire investigation. "Even if litigation is imminent, the work-product doctrine does not cover documents prepared in the ordinary course of business rather than for litigation purposes."

*Rose v. Birch Tree Holdings, LLC*, 2021 WL 6049453, at *2 (citation omitted). Defendants argue this tragic case is not standard or "routine" and that "[l]itigation is immediately anticipated." [DE 264 at 22] But this sentiment is not evidence of Auto Owners' purpose in hiring State-Wide and Tipton.

Defendants cannot remedy these problems and meet their burden by attaching a privilege log to a Reply brief and arguing that privilege attaches to specific items or parts of Tipton's deposition testimony, because they could have and should have done so in their initial materials. "Reply briefs are for replying, not raising ... arguments that could have been advanced in the opening brief." *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.,* 249 F.R.D. 530, 536 (N.D. Ill. 2008).

Defendants also move to exclude Tipton because "no party disclosed him as a testifying expert witness, and he never authored a written report." [DE 264 at 17] Defendants do not object to his qualifications, however, and any argument as to that issue is, thus, waived.

Birch Tree and Ayres did disclose Tipton as a testifying witness on September 20, 2018:

Mr. Tipton is *expected to testify concerning his observations of the scene of the subject fire incident as well as his investigation* of the fire. This may include *opinions as to the cause and origin of the fire.*

[DE 190-4 at 6) (emphasis added).

This disclosure was part of Defendants' Rule 26(a)(1)(A) disclosure, which they titled "Disclosure A". That section of the rule requires:

the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

Fed. R. Civ. P. Rule 26(a)(1)(A). Plaintiff was, thus, justified in expecting that Defendants would call Tipton as a witness of some kind at trial.

On some unstated date, Defendants decided not to disclose Tipton as a testifying expert and their subsequent disclosures, (beginning three months after Tipton's deposition) on April 13, 2022 [DE 190-4] and thereafter, simply removed Tipton. He is not referenced in any way. Defendants do not *withdraw* their previous disclosure as a testifying witness, nor re-designate him as a consulting expert, despite the fact that the Court allowed his deposition and the subpoena of his entire file, only 3 months prior.

Defendants admit that removing Tipton from their disclosures without explanation was an intentional act on their part. It was not an oversight or inadvertent:

After the lawsuit was filed, Defendant Birch Tree initially identified Jeff Tipton in its Initial Disclosures. (DE 190-4). Thereafter, however, *the determination was made not to disclose Tipton* but for him to remain a consulting expert (because no report had been produced). [note 4:] Jeff Tipton was removed from all subsequent disclosures. *He was never disclosed as a testifying expert* and no report was ever produced (or even drafted).

[DE 264 at 20] (emphasis added). Defendants' argument is not entirely true, however, because they did disclose him as a testifying witness, and they told us a bit about the subject of his expected testimony, which only an expert may offer:

Mr. Tipton is *expected to testify concerning his observations of the scene of the subject fire incident as well as his investigation* of the fire. This may include *opinions as to the cause and origin of the fire.*

[DE 190-4 at 6) (emphasis added).

It is unknown whether Tipton started out as a fact witness (standard fire investigator), later became

an intended testifying expert (at the time of initial disclosures), but later still became an expert who's expected testimony did not support Defendants' position, but that is what the evidence shows.

Tipton testified that he found and removed from the scene a burned smoke detector without a battery in it; he removed it from the scene for further testing and secured it with other evidence; and State-Wide inadvertently disposed of it; but that he was never informed that Defendants' expert later found a similar smoke detector at the scene in kitchen; and Tipton was never given an opportunity to inspect the latter found detector to see if it was the same as the one he had found and his employer lost. (Tipton at 51/6-16; 55/5-23; and 161/19-162/5) Defendants' expert Hetrick also testified that he found this purportedly second or additional smoke detector.   Todd Hetrick was asked the following:

Q .....you discovered on April 23rd 2021, a smoke detector in the property?

A.  Yes.  That is correct.   You were present at that time when I discovered that.  **(See Hetrick, p. 54, lines 11 to p 55 line 6 (remainder of testimony omitted.)**

Notably, the fire scene was investigated by six separate government agencies - Indiana Department of Homeland Security ("DHS"); Federal Bureau of Alcohol, Tobacco and Firearms ("ATF"); Carroll County Sheriff's Department; Flora Police Department; and Flora Fire Department. And Tipton testified agreeing that investigations were *led by* Indiana State Fire Marshal with help from ATF, Indiana State Police, Carroll County Sheriff's Department, Flora Fire Department, and Flora Police Department. (Tipton 52/1-10) That Defendants' expert "found" a burned smoke detector on the kitchen counter after all of this investigation is material evidence the jury should rightly hear. However, Plaintiff will contest the admissibility of this testimony.   Jeff Tipton, who retrieved the initial non-working smoke detector had discarded the original smoke detector in December 2020; he was not given the opportunity to inspect the newly found smoke detector to determine if it was the same unit he discarded earlier. (See **Tipton deposition**,162/21-25.163/5.

"Evidentiary privileges are construed narrowly because they impede the quest for truth." *Zurich Am. Ins. Co. v. Circle Ctr. Mall, LLC*, 113 N.E.3d 1220, 1227 (Ind. Ct. App. 2018).

Defendants seek to exclude Tipton because they expect Plaintiff to argue to the jury that Tipton is

Defendants' expert witness, but his testimony and opinions support Plaintiff's case:

> Plaintiff argued in her summary judgment brief (filed on February 14, 2022) that "Jeff Tipton was initially Defendants' testifying fire investigator". (Plaintiff's Brief In Support of Her Motion for Partial Summary Judgment, p. 2, DE 177). She then argued that her position on summary judgment was "supported by Defendants' own experts." (*Id.*, p. 12, DE 177). And now, in the proposed Pre-Trial Order, Plaintiff lists Jeff Tipton as "in care of" Defense Counsel.

[DE 264 at 21-22].

> The truth is that Defendants disclosed Tipton as their testifying expert witness:

> Mr. Tipton is *expected to testify concerning his observations of the scene of the subject fire incident as well as his investigation* of the fire. This may include *opinions as to the cause and origin of the fire.*

[DE 190-4 at 6) (emphasis added).

When it became clear that Tipton would not support Defendants' position, they pivoted, and claimed Tipton was merely a consulting expert, in order to prevent Plaintiff from calling him at trial. But ever since Plaintiff noticed Tipton's deposition on November 8, 2021, Defendants have been on notice that Plaintiff would use Tipton and his evidence at trial. In the intervening 19 months, Defendants have had plenty of time to seek rebuttal witnesses in order to minimize the impact of his evidence. But they do not have the right to "impede the quest for truth" *Zurich Am. Ins. Co. v. Circle Ctr. Mall, LLC*, 113 N.E.3d at 1227 with unsupported claims of privilege.

Plaintiff posits that Defendants tried to prevent Tipton's deposition altogether because they knew it would be damaging to their case on the issue of whether the "lost" smoke detector might have been fraudulently returned to the scene to be "found" later, and whether Tipton was taken off the case because he could have identified them as one and the same smoke detector.

Plaintiff also posits that Defendants want to exclude Tipton from trial because his testimony will damage their case. Tipton testified at deposition:

> Q And what's your understanding of the reason that we have smoke detectors?
> A To alert you when there is a fire.
> Q And do smoke detectors save lives?
> A They do when there's batteries in them. (Tipton 64/1-5)

Tipton also testified that on February 8, 2017 he wrote to the Indiana Department of Homeland

Security about the State of Indiana's unscientific conclusion that the fire was intentionally set; he explained that the State had prematurely closed the case because its determination that the fire was incendiary was unsupported by the evidence and testing was incomplete; Tipton included his CV to demonstrate credibility and offered to meet with Homeland Security; but someone in that agency leaked his letter to the press with Tipton's name redacted. (Tipton at pages 39-44) Of particular importance, Tipton testified:

> I e-mailed the director four times, and he wouldn't respond to my e-mails. So then I sent it to every one of the individual investigators at the Indiana Department of Homeland Security, and so one of those other guys sent it to the press.

(Tipton at 44/17-21)

> I kind of forced the issue by letting everybody know that Denny was messing this fire up, trying to get somebody to listen to me to try to have them do a proper investigation. I felt that it warranted that.

(*Id*., at 45/6-10)

> The first statement that Denny made publicly was that this was an accidental fire and it was caused likely by the cord for the refrigerator being pinched, and so that's when we brought in Jason McPherson to look at that, and that was the only specific thing that he looked at electrical-wise and did actually rule that out. So that was looked at and that was ruled out. So then Denny Randle goes from, well, this is an accidental fire from an electrical failure, and then he says that it's intentionally set. And like I said, at that point, we were supposed to have a computer fire modeling performed to help support -- because it is, there's things that would indicate it possibly could originate from that back room and there's things that would indicate that it possibly could be from the kitchen, and so this was just the next logical step to help give us another tool to look at, and then whatever that supports, then we would harvest all of the artifacts out of there. But we never got to that point because of the State of Indiana doing what they did.

(*Id*., at 46/12 - 47/8)

> Q Well, in this letter it says investigators determined the fire to be incendiary after accelerants were found in several locations of the structure. That statement you determined was false and misleading?
> A Yes. Every one of the samples that they obtained in the areas where they're saying all came back negative from lab results. So did mine. I took the same exact samples. So they had samples taken that came back negative. I took the same samples that came back negative. I had my own accelerant dog run through there, and my dog didn't alert to any ignitable liquid residue left.

*Id*., at 49/20 - 50/7)

The details and timing of Tipton's investigation and communications with Homeland Security, and his attempt to salvage the botched investigation and complete the testing in this case are "exceptional circumstances under which it is impracticable" for Plaintiff "to obtain facts or opinions on the same subject

by other means" pursuant to Fed. R. Civ. P. 26(b)(4)(D). Only Tipton can testify to the complete picture of his investigation; being removed from the investigation; why he opines that the investigation was botched by State authorities; the mysterious and suspicious circumstances surrounding the "found," "lost" and "found" smoke detector; the involvement of the press; and his opinion that smoke detectors save lives, but only if they have batteries in them. Only he can testify to this complete picture, and it should be allowed, in the interests of justice.

Pursuant to Fed. R. Civ. P. 26(b)(4)(D), and Defendants' failure to meet their burden to demonstrate privilege, Defendants' motion to exclude Tipton should be denied and Tipton should be permitted to testify at trial.

## CONCLUSION

On the basis of all of the above, Plaintiff requests that the Court deny Defendants' Motion to Exclude [DE 263].

Respectfully submitted,

_____

Nathaniel Lee

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was furnished to the following Counsel of Record via the Court's electronic filing system, on June 22, 2023, and the Parties may access this filing through the Court's system.

James J. Shea, Sr., Esq.
Jeremy D. Lemon, Esq.
Scott L Bunnell, Esq.
HUNT SUEDHOFF KALAMAROS, LLP
803 S. Calhoun St., Ste. 900
Fort Wayne, IN 46858-1489
jshea@hsk-law.com
jlemon@hsk-law.com
sbunnell@hsk-law.com

John H. Halstead, Esq.
Jonathan E. Halm, Esq.
Samantha J. Mihail, Esq.
Laura J Gard, Esq.
KIGHLINGER & GRAY, LLP
8001 Broadway Ste. 100
Merrillville, IN 46410
jhalstead@k-glaw.com
jham@k-glaw.com
smihail@k-glaw.com

Haley A. Johnston, Esq.
Jonathan A. Bont, Esq.
FROST BROWN TODD, LLP
111 Monument Circle, Suite 4500
Indianapolis, IN 46204
jbont@fbtlaw.com
hjohnston@fbtlaw.com


_____
Nathaniel Lee

Nathaniel Lee, Esq.
Robert E. Feagley II, Esq.
LEE, COSSELL & FEAGLEY, LLP
531 E. Market St.
Indianapolis, IN 46204
(317) 631-5151 telephone /    (317) 682-6477 facsimile
nlee@nleelaw.com
bfeagley@nleelaw.com